# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Williams*, 2013 IL App (1st) 112583

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SANDY WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-2583 |
| Filed<br>Rehearing denied | November 20, 2013<br>December 20, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for aggravated criminal sexual assault and aggravated kidnapping were upheld where the trial court did not abuse its discretion in admitting other-crimes evidence after duly weighing the probative value of the evidence against any possible prejudice and in rejecting defendant's request to present evidence of another male's DNA profile in the victim's sexual assault kit in order to rebut the other-crimes evidence; however, defendant's sentences were modified to run consecutively, even though he was sentenced to natural life for aggravated criminal sexual assault, since section 5-8-4(a)(ii) of the Unified Code of Corrections requires consecutive sentences when multiple sentences are imposed and defendant is convicted of aggravated criminal sexual assault. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 01-CR-14985; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed as modified. |

Counsel on
Appeal

Michael J. Pelletier and Brian W. Carrol, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Mary L. Boland and Amy W. Watroba, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.

Justices Neville and Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1      A jury convicted defendant Sandy Williams of aggravated criminal sexual assault and aggravated kidnaping of E.B. and acquitted him of armed robbery. Williams was sentenced to concurrent terms of natural life for the aggravated criminal sexual assault conviction and 20 years in prison for the aggravated kidnaping conviction.

¶ 2      Williams had previously been convicted, on August 23, 1985, for aggravated criminal sexual assault and sentenced to 25 years in prison. He was paroled on February 4, 1997, and on August 3, 2000, arrested and charged with aggravated criminal sexual assault of a 16-year-old African-American girl, N.H. Later, DNA extracted from semen on oral swabs taken from N.H. matched Williams' DNA. Williams' DNA also matched evidence recovered from the aggravated criminal sexual assaults of four other women, A.M., S.R., L.J., and E.B.

¶ 3      On June 13, 2001, Williams was arrested and charged for the assault of E.B. The matter proceeded to jury trial. Williams asserted a consent defense and, in response, the State presented testimony regarding Williams' prior criminal sexual assault of N.H. Williams argues that (1) the trial court abused its discretion in admitting other-crimes evidence of N.H.'s assault because its prejudicial effect outweighed its probative value; and (2) the trial court committed reversible error by not allowing him to present DNA evidence from N.H.'s sexual assault kit to rebut the other-crimes evidence that was offered by the State to show propensity in this case.

¶ 4      We affirm Williams' convictions finding, first, that the trial court did not abuse its discretion by admitting testimony of Williams' prior aggravated criminal sexual assault of N.H., where Williams asserted a consent defense and the evidence was presented to show propensity, and where its probative value outweighed its prejudicial effect. We find, second, that Williams did not properly preserve his claim that he should have been allowed to present

DNA evidence from the assault of N.H. to rebut the evidence of his assault on N.H. Further, we find that the trial court's denial of Williams' request to present evidence relating to another male DNA profile in N.H.'s sexual assault kit was not an abuse of discretion. This evidence was not relevant to the issue of whether N.H. consented to sexual intercourse with Williams. Finally, we modify Williams' sentence for aggravated criminal sexual assault to run consecutively rather than concurrently to the sentence for aggravated kidnaping.

¶ 5                                   BACKGROUND

¶ 6                    Motion to Admit Other-Crimes Evidence

¶ 7        In February 2009, before trial, the State filed a motion to admit evidence of other crimes under section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2008)). Specifically, the motion requested that the trial court allow evidence of other sexual assaults against A.M. and N.H. The State asserted that the close proximity in time between the assaults of E.B. (December 1, 1998), A.M. (May 26, 1999), and N.H. (August 3, 2000) weighed in favor of allowing the other-crimes evidence. The State also argued that (1) each of the sexual assaults occurred in similar areas and was carried out in a similar manner, (2) many factual similarities existed where each of the victims was an African-American young woman, was much smaller than Williams, lived near the South Side of Chicago, and was alone and vulnerable when assaulted, and (3) the assaults occurred in close geographic proximity to each other and near Williams' residence. The State maintained that the other-crimes evidence was relevant to rebut any claim by Williams that E.B. consented. Finally, the State argued that the probative value of the other-crimes evidence was not substantially outweighed by the possible prejudicial effect of the evidence.

¶ 8        Williams filed a written response to the State's motion, arguing that the probative value of the other-crimes evidence was outweighed by the prejudicial effect of the evidence. Williams argued that the time periods between the assaults were long and there were many factual dissimilarities among the assaults. He also asserted that the other-crimes evidence should not be admitted where the probative value was outweighed by the unfair prejudice. Williams noted that if the trial court granted the State's motion to admit other-crimes evidence, Williams should be allowed to present evidence that there was a mixture of DNA profiles identified from the vaginal and anal swabs taken from N.H.'s sexual assault kit.

¶ 9        The trial court conducted a hearing on the State's motion to admit the evidence. The trial court allowed the State's motion, finding (1) the probative value of the evidence outweighed any prejudicial effect, (2) the other-crimes evidence was not remote in time, (3) the evidence was factually similar, and (4) Williams asserted a consent defense. Accordingly, the trial court concluded that the other-crimes evidence pertaining to A.M. and N.H. was allowed on the issue of propensity. The trial court denied Williams' motion to reconsider the ruling.

¶ 10                                 Evidence at Trial

¶ 11       At trial, E.B. testified that on December 1, 1998, she was 16 years old and about 4 feet 9 inches tall. On that evening, E.B. was visiting her boyfriend, Mario Johnson, at his apartment at 64th Street and Lowe Avenue in Chicago. E.B. testified that she and Johnson

kissed and he gave her a "hickey" on her neck. Johnson wanted to engage in further sexual activity, but they did not because E.B. was menstruating.

¶ 12    At about 9:45 p.m., E.B. walked to the bus stop next to the Aldi grocery store at 63rd Street and Lowe Avenue to take the bus home. Johnson walked E.B. half way to the bus stop, then she walked the rest of the way alone. When E.B. arrived, Williams was also waiting at the bus stop. After a long wait for the bus, E.B. decided to walk to a friend's house a few blocks away, on 59th Street, to call her mother for a ride home. E.B. walked through the Aldi parking lot, toward 59th Street. When she looked behind her, she saw that Williams was also walking through the parking lot. Williams then "angled off" and started to walk in a different direction so that it no longer appeared that he was following her.

¶ 13    E.B. testified that as she continued to walk toward her friend's house, she saw another shadow run up to her. Williams grabbed her by the neck from behind, placed a knife to her neck, and said, "Bitch, don't you holler, don't you scream, don't you say shit or I'm going to cut you." E.B. began to panic and cry. Williams asked her if she had any money and where she lived. He then placed his arm around E.B.'s shoulder and walked along-side her, creating the appearance that they were a couple. Williams held the knife pressed to E.B.'s neck as he looked for a place to take her. E.B. testified that Williams seemed like "a giant" to her and she was afraid he would cut her. Williams instructed her to stop crying and that once he cut the vein in her throat, E.B. would bleed to death.

¶ 14    E.B. tried to get away, but Williams grabbed her jacket and she got caught in the drawstring. Williams hit E.B. in the face and said, "[B]itch, I'm not playing with you." Williams then dragged E.B. toward a dark area on the side of the Aldi where the shopping carts were stored. E.B. grabbed a railing to try to stop him from dragging her into the dark area, but Williams beat her fingers then tried to cut her fingers with the knife. E.B. let go of the railing so that her fingers would not be cut, and Williams dragged her behind the shopping carts, where he ripped off her shirt and pulled down her pants. Williams pinned E.B.'s thighs down with his legs and inserted his penis into her vagina. After he ejaculated, Williams pulled up his pants and ran away.

¶ 15    E.B. testified that she put her clothes back on, but could not find her underwear. She ran back to Johnson's apartment. On the way, she saw Johnson's brother and told him what happened. E.B. then told Johnson what happened and the police arrived at his apartment. E.B. described the assault to the police and was taken to the hospital, where she described the assault to the doctor and nurse. E.B. had pain in her jaw from where Williams hit her, pain in her neck from where the knife was pressed into her, and pain in her vagina from the rape. E.B. had a pelvic exam performed and was given medicine for her pain.

¶ 16    On June 13, 2001, E.B. viewed a lineup at the police station and identified Williams as the individual who assaulted her. After visually identifying Williams, E.B. asked the detectives if she could hear the lineup participants speak. E.B. testified that when she heard Williams' voice, it immediately confirmed that he was the person who raped her.

¶ 17    Mario Johnson testified, that on the date in question, he was E.B.'s boyfriend. On the evening of December 1, 1998, Johnson and E.B. were talking and kissing in the hallway of his apartment. Johnson testified that he was "a very bad guy" back then and made E.B. leave

because she was menstruating and unable to have sex with him that night. Johnson testified that he gave E.B. a hickey on her neck because he was cheating on her with another girl and wanted to make E.B. feel better. Johnson testified that he walked E.B. half way to the bus stop because he wanted to get back home to the other girl.

¶ 18    Johnson testified that later that evening, his brother brought E.B. back to his apartment. E.B. was crying, her clothing was torn off. E.B. told him that she had been raped and described her assailant. Johnson's brother gave E.B. a shirt to wear, and Johnson and his brother left to look for E.B.'s assailant. Johnson's mother called him back to the apartment and he accompanied E.B. to the hospital. Johnson also testified that an investigator from the Cook Count State's Attorney's office took a swab of his mouth, pursuant to his consent.

¶ 19    Jane Malaluan, testified that she was the nurse who treated E.B. in the emergency room that night. Malaluan observed that E.B. had human bite marks on her neck and tenderness in her vaginal area. Malaluan was present when a sexual assault kit was performed on E.B., which included swabs of her vagina and neck, and a blood sample.

¶ 20    Two forensic biologists from the Illinois State Police crime lab testified regarding the vaginal swabs from E.B.'s sexual assault kit. The biologists testified that the swabs tested positive for the presence of semen, though at the lowest possible level. The kit also contained swabs that tested negative for semen but positive for saliva. The amount of DNA extracted from the vaginal swabs was too small for the type of DNA analysis performed at that time by the Illinois State Police crime lab, so the samples were stored for future analysis.

¶ 21    In 2001, the Illinois State Police lab sent the vaginal swabs from E.B.'s sexual assault kit to Cellmark Diagnostics for further DNA analysis. Dr. Robbin Cotton testified, as a DNA expert from Cellmark, that analysis of the semen from the swabs produced a male DNA profile. But, Cellmark did not have a known male sample to compare to that profile. Dr. Cotton testified that there was a clear primary male donor in the sperm fraction, as well as three small signals that could have been either a second male donor or machine-generated artifacts.

¶ 22    A blood sample was taken from Williams in August 2000, while he was in custody on a different matter. Sandra Lambatos, a DNA expert, testified that the major male profile deduced by Cellmark for E.B.'s vaginal swab matched the DNA profile derived from William's blood sample.

¶ 23    The parties stipulated that the male DNA profile found on the swab of E.B.'s bite mark matched the DNA profile from Johnson's buccal swab.


¶ 24                            Other-Crimes Evidence

¶ 25    The State called Eddie Kimble to testify regarding the assault of N.H. Kimble testified that at about 9 p.m., on August 3, 2000, he and his two sons were walking their dog in a park near 75th Street and Jeffrey Boulevard. Kimble saw a man on top of a woman in the grass a few feet from the sidewalk. Kimble testified that it appeared that the man and woman were having sex. Kimble did not think much of it because it was not uncommon to see such activity in the park. But, as Kimble walked past, he noticed that the man had his hand over the woman's face. Kimble asked if everything was alright, and the woman screamed "Help

me" and "He raped me and he is trying to kill me." The woman was screaming and hysterical. Kimble asked the man to get off the woman, and the man, whom Kimble identified as Williams, told Kimble to leave and mind his own business. Williams also told Kimble that the woman was his girlfriend and that everything was okay. Kimble testified that the woman sounded desperate and was trying to separate herself from Williams.

¶ 26    Kimble told his sons to run to the gas station to call police, then Kimble dialed 911 on his cell phone. Williams stood up and pulled up his pants. Kimble was talking to the police on his cell phone and told Williams to let the woman go. The woman broke free from Williams and ran to Kimble. Kimble saw that her eyes and face were swollen and bloody. She was also missing some articles of clothing. The woman asked Kimble not to leave because if he did, she thought Williams would kill her. Williams moved toward Kimble in a manner that led him to believe that Williams was going to hit him. Kimble testified that he decided to stay with the woman and defend himself. Kimble heard sirens nearby and then Williams walked away. Kimble testified that he subsequently identified Williams in a lineup at the police station.

¶ 27    Officer Tamara Matthews testified that, on August 3, 2000, she and her partner responded to a call of criminal sexual assault and met Kimble and N.H. at the scene. Officer Matthews noticed that N.H.'s face was swollen and covered in blood and her clothing was disheveled. Kimble provided Officer Matthews with a description of N.H.'s assailant. Officer Matthews drove around the area and, within minutes, saw Williams about three blocks from the park. Williams matched Kimble's description and he had blood dripping from his hands and on his clothing. Officer Matthews placed Williams in custody. Officer Matthews testified that upon returning to the park, she observed a pair of women's underwear, a sock, a shoe, a set of keys, and a shirt at the scene. Officer Matthews called for an evidence technician and turned the case over to detectives.

¶ 28    Williams chose not to testify and the defense rested without presenting evidence.

¶ 29    During closing arguments, the defense did not challenge the fact that Williams had sex with E.B., but, rather, asserted that the encounter was consensual. The defense pointed to inconsistencies between E.B.'s testimony and other trial evidence, and noted that the DNA evidence raised some possibility of the presence of semen from someone other than Williams. The defense argued that the jury should disregard the other-crimes evidence because Kimble did not witness the actual assault and N.H. did not testify in this case. The State argued that E.B. provided credible testimony about the sexual assault, which was corroborated by the DNA evidence and testimony from Johnson. The State responded in rebuttal that, just as in the case of N.H., the sexual encounter between Williams and E.B. was not consensual.

¶ 30    The jury found Williams guilty of aggravated criminal sexual assault and aggravated kidnaping, and acquitted him of armed robbery. The trial court denied Williams' motion for a new trial and sentenced him to concurrent terms of natural life in prison and 20 years in prison.

¶ 31    Williams timely appeals.

¶ 32 ANALYSIS

¶ 33 Propriety of the Other-Crimes Evidence

¶ 34 Williams first contends that the trial court abused its discretion in admitting evidence of the prior criminal sexual assault of N.H. Williams argues that the prejudicial effect of this other-crimes evidence outweighed any probative value where: (1) the assaults were not particularly close in time, (2) the assaults were not factually similar, and (3) other relevant factors weighed against admission.

¶ 35 A decision to admit evidence of a prior criminal offense rests within the sound discretion of the trial court, and we will not reverse its decision unless there was a clear abuse of discretion. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). We will find an abuse of discretion only when a trial court's decision is "arbitrary, fanciful or unreasonable" or "where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 36 Section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2008)) provides an exception to the common law bar against the use of other-crimes evidence to show propensity in cases, where, as here, a defendant is accused of criminal sexual assault. Under this section, evidence of another criminal sexual assault "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2008). Our supreme court has held that under this statute, relevant matters include allowing evidence of other-crimes to show a defendant's propensity to commit sex offenses. *Donoho*, 204 Ill. 2d at 176. Under this interpretation, other-crimes evidence is probative to rebut a defendant's claim of consent. *People v. Johnson*, 389 Ill. App. 3d 618 (2009); see also *People v. Boyd*, 366 Ill. App. 3d 84, 93 (2006).

¶ 37 Where the other-crimes evidence meets the threshold statutory requirement of relevance and contains probative value, it is presumed to be admissible if its probative value is not substantially outweighed by its prejudicial effect. *Donoho*, 204 Ill. 2d at 182-83. The statute provides:

"In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2008).

Williams does not dispute that the other-crimes evidence satisfied the statutory requirements for admissibility under section 115-7.3. Williams additionally does not contest the relevance of other-crimes evidence to the consent defense, nor that it contains probative value. Rather, Williams claims that the trial court erred in its application of the balancing test prescribed by section 115-7.3(c). Accordingly, the question for us on appeal is whether the trial court abused its discretion when it determined that the prejudicial effect of the evidence of Williams' prior offense was not *substantially* greater than its probative value. 725 ILCS 5/115-7.3(c) (West 2008).

¶ 38    The record shows that the trial court properly conducted an analysis of the three factors listed in the statute for weighing the probative value of the other-crimes evidence against the danger of unfair prejudice. At the pretrial hearing, the trial court noted:

> "[I] find that every prong of *Donoho* has been met. And the court will admit that these matters were not remote in time. They were factually similar. And the third prong is met that there is a consent defense. The court finds that it is very relevant. So every prong has been met of the *Donoho* case and the statute, and the court finds that on the issue of propensity, these other prior matters will come in."

The trial court further explained, "[A]fter weighing the probative and relevant nature of these prior cases against the undue prejudice, the court finds that it is very much relevant, and it outweighs the undue, any prejudice that would come about by having these other cases come into play here."

¶ 39    Nonetheless, Williams contends that the trial court erred where (1) the proximity in time, (2) factual dissimilarities, and (3) other relevant factors precluded the trial court from properly admitting the other-crimes evidence.

¶ 40                    *Proximity in Time Between Charged Offense*
                    *and Other-Crimes Evidence*

¶ 41    With respect to the time difference between the other-crimes evidence and the charged offense, our supreme court held in *Donoho*:

> " '[The] admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged.' [Citation.] Instead, courts should evaluate this issue on a case-by-case basis. [Citation.] Therefore, we decline to adopt a bright-line rule about when prior convictions are *per se* too old to be admitted under section 115-7.3. Instead, it is a factor to consider when evaluating its probative value." *Donoho*, 204 Ill. 2d at 183-84 (quoting *People v. Illgen*, 145 Ill. 2d 353, 370 (1991)).

The *Donoho* court then held that a 12- to 15-year time gap between offenses, by itself, was insufficient to render the admission of a prior offense an abuse of discretion. *Donoho*, 204 Ill. 2d at 184. The appellate court has upheld other-crimes evidence that was more than 20 years old. *People v. Davis*, 260 Ill. App. 3d 176, 192 (1994).

¶ 42    In the present case, the charged offense occurred 20 months before the sexual assault against N.H. This is a relatively short gap in time between crimes, which the trial court properly determined weighed in favor of admissibility.

¶ 43                        *Degree of Factual Similarity*

¶ 44    Other-crimes evidence must have " 'some threshold similarity to the crime charged' " to be admissible. *Donoho*, 204 Ill. 2d at 184 (quoting *People v. Bartall*, 98 Ill. 2d 294, 310 (1983)). As factual similarities increase, so does the relevance, or probative value, of the other-crimes evidence. *Donoho*, 204 Ill. 2d at 184.

¶ 45    We find that the facts of the 1998 assault against E.B. are sufficiently similar to the facts

-8-

of the 2000 assault against N.H. The sexual assaults against E.B. and N.H. were in the same area of the city, within miles of each other on the south side of Chicago. The victims were African-American and 16 years old at the time of the assaults. Further, the assaults occurred at night when both victims found themselves alone and vulnerable. The victims were both penetrated vaginally by their assailant.

¶ 46    Williams contends that there are "substantial factual differences" between the two assaults; for example, while there was a knife in the current case, no knife was used in the assault of N.H. Also, N.H. was severely beaten in the face and sexually assaulted in an open area of a park, while E.B. was not severely beaten and was brought to a hidden area of a parking lot. In addition, N.H.'s assailant asked her a question before attacking her, while E.B.'s assailant silently approached her. While Williams highlights these factual differences, our supreme court has instructed that " 'mere general areas of similarity will suffice' to support admissibility" where the evidence is not being offered under the *modus operandi* exception. *Donoho*, 204 Ill. 2d at 184 (quoting *Illgen*, 145 Ill. 2d at 372-73). Some differences between the offenses do not defeat admissibility "because no two independent crimes are identical." *Donoho*, 204 Ill. 2d at 185. As this court has previously concluded, " 'Even though defendant correctly observes these factual discrepancies, we find that he exaggerates their significance in light of the stated compelling similarities.' " *People v. Ross*, 395 Ill. App. 3d 660, 676 (2009) (quoting *People v. Taylor*, 383 Ill. App. 3d 591, 596 (2008)).

¶ 47    Williams argues that we should follow *People v. Johnson*, where this court held that "significant dissimilarities" between the two assaults, along with the trial court's failure to conduct a meaningful assessment of the other-crimes evidence's prejudicial effect, led to the conclusion that the trial court erred in admitting other-crimes evidence to establish the defendant's propensity to commit sexual offense. *People v. Johnson*, 406 Ill. App. 3d 805, 812 (2010). Unlike *Johnson*, the trial court carefully weighed the probative value against the prejudicial nature of the other-crimes evidence. In addition, *Johnson* rests on factual circumstances not present in Williams' case. In *Johnson*, the victim in the prior offense was assaulted by the defendant and another perpetrator, while the charged offense involved the defendant alone with the victim. *Johnson*, 406 Ill. App. 3d at 811. The testimony in the earlier case also showed that the defendant forced cocaine and alcohol on the previous victim and anally penetrated her, which was conduct absent from the charged offense. *Johnson*, 406 Ill. App. 3d at 808, 811. The differences both in the number of perpetrators and in the defendant's conduct during the assaults weighed against the relevance of the prior assault to the charged offense in that case. *Johnson*, 406 Ill. App. 3d at 811-12.

¶ 48    In contrast, the prior crime contains only minor factual dissimilarities. The assault against N.H. occurred at night in a park while the assault against E.B. happened at night in a parking lot. The assault against E.B. involved the use of a knife and the assailant using his body to hold the victim down to penetrate her vaginally, while the assault against N.H. involved beating her and then the assailant lying on top of her to penetrate her vaginally. In one case, the assailant asked a question before the attack while in the other case, the assailant was silent before attacking his victim. We find that these dissimilarities are not enough to disqualify the other-crimes evidence. The similarities as noted above, include: both victims

were 16 years old; both victims were African-American; the victims were both alone at night; the assaults occurred in close geographic proximity to each other; they both involved vaginal penetration; and the assailant held the victims down with his body weight. These similarities are enough to fall within the requisite "general areas of similarity" as articulated by our supreme court. (Internal quotation marks omitted.) *Donoho*, 204 Ill. 2d at 184. We find no error in the trial court's consideration of the factual dissimilarities.

¶ 49                               *Other Relevant Factors*

¶ 50        In the present case, the other-crimes evidence was used to meet Williams' consent defense. This court has previously noted that a defendant's "no-force" defense at trial increased the probative value of the other-crimes evidence. *Ross*, 395 Ill. App. 3d at 674-75. In addition, although the trial court found both sexual assaults against A.M. and N.H. were relevant and admissible, the State only presented evidence as to the assault against N.H. The State's decision to limit the amount of other-crimes evidence reduced the possible prejudicial effect of the evidence at defendant's trial. See *People v. Johnson*, 406 Ill. App. 3d 805, 810 (2010).

¶ 51        In sum, we find that the trial court properly weighed the probative value of the other-crimes evidence against the prejudice to Williams and did not abuse its discretion in admitting such evidence.

¶ 52                          Rebuttal of Other-Crimes Evidence

¶ 53        Williams also contends that the trial court erred in denying his request to present evidence that N.H.'s sexual assault kit showed mixed DNA profiles. Williams argues that he should have been allowed to introduce evidence that an unknown male DNA profile was found on N.H.'s vaginal and rectal swabs to rebut the other-crimes evidence.

¶ 54        Initially, the State argues that Williams waived this argument by not filing a motion to admit this evidence, or making an offer of proof to the trial court regarding the DNA results from N.H.'s sexual assault kit. The record shows that Williams filed a response to the State's motion to admit the other-crimes evidence, in which Williams argued: "Should this Honorable Court sustain the State's motion to allow proof of other crimes, Mr. Williams would request that this Honorable Court ensure that the DNA evidentiary issues from the case involving [N.H.] also come to light. There was a mixture of DNA profiles identified from the vaginal swabs [and] *** rectal swabs ***. Given the consideration that someone else's DNA was found in her vagina and rectum, this information must be included should this Honorable Court grant the State's motion, as anything else would be misleading, biased, and incomplete." At the hearing on the State's motion, Williams also argued that the swabs from N.H.'s sexual assault kit indicated "the probability of additional sources of human DNA both in the anal and the vaginal swabs." In response, the State objected to Williams' request and argued that the admission of the DNA results would result in a "mini trial," which Illinois courts have cautioned against. Therefore, the record indicated that Williams raised this argument before the trial court.

¶ 55        But, Williams failed to include his argument with respect to the DNA evidence in his

motion for a new trial. "It is well settled that, to preserve an issue on appeal, a defendant must object to the purported error at trial and include it in his written posttrial motion." *People v. Glasper*, 234 Ill. 2d 173, 203 (2009). Otherwise, the argument is forfeited on appeal. *Id.* Williams did not raise the issue in his posttrial motion. Accordingly, the issue is forfeited. Williams, nonetheless, contends that the issue is reviewable under plain error analysis.

¶ 56    The plain error doctrine allows us to consider a forfeited error when either (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatens to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affects the fairness of the defendant's trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under both prongs of the plain error analysis, the burden of persuasion remains with the defendant. *Id.* Ultimately, before a plain error analysis may be undertaken, the defendant must show that an error occurred, for, absent error, there can be no plain error. See *People v. McGee*, 398 Ill. App. 3d 789, 794 (2010) (citing *People v. Herron*, 215 Ill. 2d 167, 187 (2005)).

¶ 57    Here, Williams argues that the trial court abused its discretion by precluding the admission of evidence that N.H.'s sexual assault kit contained another male DNA profile to rebut the evidence of N.H.'s sexual assault. Williams asserts that the DNA evidence was highly probative because it related to the credibility of the other-crimes evidence and its exclusion was highly prejudicial because without the DNA evidence, the jury was presented with an "incomplete, misleading, and highly inflammatory version of the story."

¶ 58    We note that rebuttal of other-crimes evidence is contemplated by the plain statutory language of section 115-7.3, which permits admission of both evidence of "defendant's commission of another [enumerated] offense or offenses" and "evidence to rebut that proof or an inference from that proof." 725 ILCS 5/115-7.3(b) (West 2008); see also *People v. Ward*, 2011 IL 108690, ¶ 27. Under this section, evidence of another criminal sexual assault or, with respect to this argument, evidence to rebut that proof, "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2008).

¶ 59    Williams claims that he should have been permitted to cross-examine Kimble's testimony that he observed Williams sexually assaulting N.H. with evidence that showed another male DNA profile in N.H.'s sexual assault kit. In this appeal, Williams relies on a lab report from the Illinois State Police, Division of Forensic Services. The lab report indicated that semen from the oral swab from N.H.'s sexual assault kit matched Williams' DNA, but semen from the vaginal and anal swabs matched an unidentified male DNA profile. Williams asserts that he should have been permitted to present this DNA evidence to challenge the other-crimes evidence presented and Kimble's testimony that Williams engaged in vaginal sex with N.H. The State argues that Williams is precluded from relying on the lab report where it was not a document entered into the record before the trial court and this court is not permitted to take judicial notice of it. As previously explained, however, the record shows that the parties presented arguments before the trial court on the admissibility of evidence pertaining to the presence of another male DNA profile in N.H.'s

sexual assault kit. The results of the DNA testing performed on N.H.'s sexual assault kit were referred to throughout the trial record. Therefore, we will address Williams' argument in this respect.

¶ 60    While section 115-7.3(b) permits evidence to rebut other-crimes evidence, the rebuttal evidence must pass the threshold statutory requirements of admissibility and relevance. 725 ILCS 5/115-7.3(b) (West 2008); *Donoho*, 204 Ill. 2d at 182-83. The Illinois rape shield law prevents a defendant from introducing certain evidence pertaining to a complainant's prior sexual activity. Section 115-7(a) of the Code provides:

> "[T]he prior sexual activity or the reputation of the alleged victim or corroborating witness under Section 115-7.3 of this Code is inadmissible except (1) as evidence concerning the past sexual conduct of the alleged victim or corroborating witness under Section 115-7.3 of this Code with the accused when this evidence is offered by the accused upon the issue of whether the alleged victim or corroborating witness under Section 115-7.3 of this Code consented to the sexual conduct with respect to which the offense is alleged; or (2) when constitutionally required to be admitted." 725 ILCS 5/115-7(a) (West 2008).

Here, neither exception applies. N.H. did not have a prior sexual relationship with Williams. In *People v. Cornes*, the court explained:

> "Defendant's right of confrontation necessarily includes the right to cross-examine witnesses, but that right does not extend to matters which are irrelevant and have little or no probative value. Complainant's past sexual conduct has no bearing on whether she has consented to sexual relations with defendant. The legislature recognized this fact and chose to exclude evidence of complainant's reputation for chastity as well as specific acts of sexual conduct with third persons in cases of rape and sexual deviate assault. *** The legislature was acting well within its powers in enacting reasonable legislation intended to eliminate the cruel and abusive treatment of the victim at trial by precluding the admission of prejudicial and irrelevant material and to promote the lawful administration of the criminal justice system." *People v. Cornes*, 80 Ill. App. 3d 166, 175-76 (1980).

In *People v. Sandoval*, our supreme court determined that, under the Illinois rape shield law, the defendant in a rape trial was not entitled to present evidence rebutting the victim's direct testimony that she had never had anal sex with a man other than defendant. The court explained that the victim's prior sexual encounters with a third party had no impact on the issue of consent and were not relevant to the victim's bias, prejudice or motive to testify falsely in charging the defendant. *People v. Sandoval*, 135 Ill. 2d 159, 176 (1990). The court noted that the defendant was not prevented from presenting his theory of the case by exclusion of this evidence. *Id.* at 180-81.

¶ 61    The evidence regarding the presence of another unknown male DNA profile in N.H.'s sexual assault kit had no bearing on whether N.H. consented to sexual intercourse with Williams. Rape shield statues, however, do not prevent a defendant from introducing evidence of the victim's past sexual conduct when it is relevant to establish bias, motive, or prejudice. *Sandoval*, 135 Ill. 2d at 174-75. The introduction of DNA evidence indicating that N.H. engaged in sexual activity with an individual other than Williams would not have shed

light on any motive or bias that N.H. might have had against Williams. Therefore, we find the trial court's exclusion of evidence relating to the DNA profiles in N.H.'s sexual assault kit to rebut the evidence of N.H.'s sexual assault was not an abuse of discretion. Since we find no error, we decline to review Williams's contention under the plain error analysis.

¶ 62 Williams relies on our supreme court's determination in *Ward*, 2011 IL 108690, to support his argument that he should have been permitted to rebut the evidence of N.H.'s sexual assault with the DNA evidence contained in her sexual assault kit. In *Ward*, our supreme court held that the trial court abused its discretion by refusing to admit evidence of the defendant's acquittal of a criminal sexual assault where that criminal sexual assault had been presented as other-crimes evidence. The *Ward* defendant was charged with the criminal sexual assault of M.M., and the trial court admitted evidence, under section 115-7.3 of the Code, that the defendant had also been involved in the criminal sexual assault of another woman, L.S. When the defendant sought to have evidence admitted of his acquittal in L.S.'s case, the trial court rejected his request. *Id.* ¶ 1. Our supreme court held that "the acquittal evidence that the defendant sought to admit would have aided in rebutting the inference created by L.S.'s testimony that he had a propensity to commit sex offenses, making it admissible under section 115-7.3." *Id.* ¶ 27. The court found that the acquittal evidence was relevant and the probative value of the evidence was not outweighed by undue prejudice. *Id.* ¶¶ 38, 41. The court concluded that the acquittal evidence was necessary to provide "a full context for the other-crimes testimony" and, therefore, the barring of the admission of the acquittal evidence was an abuse of the trial court's discretion. *Id.* ¶¶ 46, 48.

¶ 63 We find *Ward* distinguishable from the present case. In *Ward*, the court considered the admission of acquittal evidence to rebut the other-crimes evidence introduced in that case. In contrast, the evidence here involved the victim's alleged sexual conduct with a third person. The court in *Ward* found that the acquittal evidence was relevant to rebut the inference that the defendant had a propensity to commit sex offenses. Unlike *Ward*, the evidence regarding the presence of another male DNA profile is not relevant to the issue of whether N.H. consented to sexual intercourse with Williams. Nor is the DNA evidence relating to another male donor profile relevant to rebut the inference that Williams had a propensity to commit sex offenses. Further, as explained above, the Illinois rape shield law restricts the admission of such evidence as it relates to N.H.'s alleged sexual conduct with a third person. The trial court's denial of Williams' request to present the DNA evidence from N.H.'s sexual assault kit was not an abuse of discretion.

¶ 64                                                    Sentencing

¶ 65 In its brief, the State requests that we modify Williams' sentence for aggravated criminal sexual assault to run consecutively to the sentence for aggravated kidnaping. Williams did not respond to this contention.

¶ 66 Section 5-8-4(a)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a)(ii) (West 2008) (now 730 ILCS 5/5-8-4(d)(2) (West 2010))) requires that consecutive sentences be imposed where multiple sentences are imposed and the defendant was convicted of aggravated criminal sexual assault. A sentence that does not conform to a statutory

requirement is void, and we may correct a void sentence at any time. *People v. Arna*, 168 Ill. 2d 107, 113 (1995).

¶ 67    Because Williams was convicted of aggravated criminal sexual assault, he is subject to consecutive sentences even though he was sentenced to natural life. See *People v. Petrenko*, 237 Ill. 2d 490, 506-07 (2010) (natural life sentences are subject to consecutive sentencing mandates of section 5-8-4(a)). In *People v. Williams*, 238 Ill. 2d 125, 151 (2010), the supreme court, citing *Petrenko*, held that a 60-year sentence for aggravated kidnaping was properly ordered to be served consecutively to two concurrent natural life sentences for aggravated criminal sexual assault. Similarly, in the present case, the 20-year prison term for aggravated kidnaping must be served consecutively to the natural life sentence for aggravated criminal sexual assault and we modify the sentence accordingly.

¶ 68                                                CONCLUSION

¶ 69    We find that the trial court properly weighed the probative value of the other-crimes evidence against the prejudice to Williams and did not abuse its discretion in admitting such evidence. Nor did the trial court abuse its discretion in denying Williams' request to introduce evidence pertaining to the presence of another male DNA profile in the victim's sexual assault kit to rebut the other-crimes evidence. Therefore, we affirm Williams' convictions but modify his sentences to run consecutively.

¶ 70    Affirmed as modified.